UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARL ULFSSON BONDE,

Plaintiff,

-against-

WEXLER & KAUFMAN, PLLC, BRETT WEXLER, and EVAN TEICH,

Defendants.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Carl Ulfsson Bonde alleges as follows for his Complaint and Demand for Jury Trial against defendants Wexler & Kaufman, PLLC, Brett Wexler, and Evan Teich:

**Nature of the Case**

1. This is a lawsuit for legal malpractice, breach of contract, and conversion. Plaintiff retained the defendant attorneys to represent him in the sale of his condominium apartment in Manhattan. The defendants held themselves out as attorneys with an expertise in real estate. They undertook to represent plaintiff in all aspects of the transaction, including receipt and delivery of certain sale proceeds to plaintiff.

2. As plaintiff's attorneys, defendants had the legal, ethical, and fiduciary duty to protect their client's interests and his funds. This included the duty to protect the confidentiality and integrity of the files, documents, and communications relating to the transaction. Defendants breached all these duties. Through their negligence, they permitted cybercriminals to gain access to information relevant to the transaction sufficient.

3. The cybercriminals used this information to impersonate plaintiff and his wife on the day of the closing and to send fraudulent wire instructions to defendants to divert the sale proceeds. The defendant attorneys failed to realize this, even though they received bona fide wire

instructions from plaintiff ***before*** receiving the fraudulent instructions. The defendant attorneys never verified the emails or wire instructions they received and sent plaintiff's sale proceeds to the cybercriminal. The general chronology of these events was as follows:

- Plaintiff Carl Ulfsson Bonde retained defendants Wexler & Kaufman, PLLC, Brett Wexler, and Evan Teich to represent him in the sale of his apartment;
- Defendants agreed to act as attorneys and to receive and disburse certain sale proceeds from their attorney trust account;
- The sale closed on August 22, 2022 and plaintiff gave defendants accurate wire instructions for delivery of sale proceeds of over $427,000;
- Defendants failed to verbally confirm the wiring instructions, a clear violation of their legal and ethical duties and best practices for wire transfers;
- A cybercriminal impersonated plaintiff and later sent defendants fraudulent bank wire instructions from an email address different from plaintiff's;
- Defendants again failed to verbally confirm wire instructions – this failure is particularly egregious given that this was a second, conflicting set of wire instructions received by the firm, a clear indication that criminal activity is afoot;
- Defendants wired over $427,000 in plaintiff's sale proceeds to wrong bank account as directed by the cybercriminal;
- Defendants give plaintiff false assurances the wire would be recalled;
- Defendants fail to mitigate, fail to investigate, fail to notify authorities, fail to advise client on rights and courses of action and conflict with current representation, fails to provide copies of emails, and put their own self-interest above those of their client to avoid their responsibility for the loss of plaintiff's funds.

4. Defendants' negligence in failing to protect the confidentiality and integrity of both the information and communications relating to the transaction, their failure to take simple

steps to verify email addresses and wire instructions, their disregard of bona fide wire instructions, and their failure to realize they had been given conflicting wire instructions, all allowed cybercriminals to divert all of plaintiff's net sale proceeds leaving plaintiff with an uncompensated loss of over $427,000, plus prejudgment interest, attorney's fees, costs, and the expenses of this enforcement action.

5. Plaintiff has repeatedly requested that defendants reimburse them for the stolen funds or at the very least, provide information relating to the fraudulent wire transfer but they have refused.

**Jurisdiction and Venue**

6. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2) because plaintiff is a citizen of Sweden and defendants are citizens of New York State and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Venue is proper within this District pursuant to 28 U.S.C. § 1391(b)(1) because one or more of the defendants resides in this District and they all do business here.

8. Venue is proper within this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred here.

**The Parties**

9. Plaintiff Carl Ulfsson Bonde is a citizen of Sweden and is permanently domiciled in London England.

10. Defendant Wexler & Kaufman, PLLC ("Wexler & Kaufman") is a law firm organized as a New York professional limited liability company with a place of business at One Penn Plaza in Manhattan.

11.     Upon information and belief, defendant Brett Wexler resides in New York.

12.     Wexler is an attorney admitted to practice law in New York.

13.     At all relevant times, Wexler was either a member of Wexler & Kaufman or an attorney in its employ.

14.     Upon information and belief, defendant Evan Teich resides in New York.

15.     Teich is an attorney admitted to practice law in New York.

16.     At all relevant times, Teich was either a member of Wexler & Kaufman or an attorney in its employ. Teich was admitted to practice law on August 4, 2022, less than a month before the transaction at issue.

17.     At all relevant times, defendants Wexler and Teich were acting in their capacities as either members or employees of Wexler & Kaufman and within the scope of their authority.

**Retainer of Defendants**

18.     In 2022, plaintiff put his condominium apartment, Unit 7B at 22 Renwick Street in Manhattan, on the market.

19.     In June 2022, plaintiff retained Wexler & Kaufman to represent him in the sale of his apartment.

20.     The defendant attorneys agreed to represent and advise plaintiff in connection with the sale of his apartment.

21.     Defendants Wexler and Teich were the attorneys at Wexler & Kaufman responsible for representing and advising plaintiff in the sale of his apartment. Wexler was the attorney with chief responsibility for the transaction and for supervising Teich.

22. The defendant attorneys claimed to have extensive experience in real estate transactions such as the sale of the apartment.

23. The Wexler & Kaufman website states that the firm has extensive experience representing parties in real estate transactions:

https://www.wlklegal.com/services (April 3, 2023)

24. The Wexler & Kaufman website states that Wexler's legal experience "involves all aspects of residential and commercial real estate transactions":

BRETT WEXLER, ESQ.

Brett Wexler is a co-founding partner of Wexler & Kaufman. A seasoned lawyer, Brett offers clients a unique business perspective that is the cornerstore of WK's philosophy and success.

Brett' experience involves all aspects of residential and commercial real estate transactions: financing, acquisitions, development, dispositions, leasing and workouts. He has represented buyers, sellers, investors, developers, lenders, and borrowers in a variety of transactions and advises landlords and tenants on commercial leasing transactions.

Brett Wexler

https://www.wlklegal.com/partners (April 3, 2023)

25. Wexler & Kaufman claims to be one of the top New York real estate firms. For example, partner Marc Kaufman posted a link on his LinkedIn page to an article ranking Wexler

& Kaufman #18 in New York City based on having completed 323 real estate transactions valued at over $600 million for the one-year period ending July 2022:

NYC'S TOP LAW FIRMS
JULY 2021 - JULY 2022

| RANK | FIRM | DEAL VOLUME | # OF DEALS |
|---|---|---|---|
| 1 | KIRKLAND & ELLIS | $3.27B | 20 |
| 2 | GREENBERG TRAURIG | $3.11B | 24 |
| 3 | GIBSON, DUNN & CRUTCHER | $3.01B | 9 |
| 4 | SKADDEN, ARPS, SLATE, MEAGHER & FLOM | $1.99B | 6 |
| 5 | ROMER DEBBAS | $1.63B | 490 |
| 6 | COHEN & FRANKEL | $1.24B | 279 |
| 7 | SANDOR D. KRAUSS | $1.18B | 376 |
| 8 | WILLKIE FARR & GALLAGHER | $1.15B | 31 |
| 9 | PILLSBURY WINTHROP SHAW PITTMAN | $1.03B | 1 |
| 10 | CHAVES PERLOWITZ LUFTIG | $942.46M | 447 |
| 11 | SCHWARTZ LEVINE STARK | $932.58M | 371 |
| 12 | KONNER GERSHBURG MELNICK DAROUVAR | $902.92M | 375 |
| 13 | SEYFARTH SHAW | $898.85M | 27 |
| 14 | YEUNG & WANG | $815.97M | 565 |
| 15 | KING & SPALDING | $774.47M | 3 |
| 16 | ROSENBERG & ESTIS | $752.12M | 27 |
| 17 | FRIED, FRANK, HARRIS, SHRIVER & JACOBSON | $664.65M | 24 |
| 18 | WEXLER & KAUFMAN | $604.87M | 323 |
| 19 | SIMPSON THACHER & BARTLETT | $593.86M | 7 |
| 20 | BELKIN BURDEN & GOLDMAN | $567.89M | 94 |
| 21 | OLSHAN FROME WOLOSKY | $542.47M | 8 |
| 22 | WINDELS MARX LANE & MITTENDORF | $526.48M | 106 |
| 23 | GOLDBERG WEPRIN FINKEL GOLDSTEIN | $485.18M | 53 |
| 24 | SCOTT SEGAL | $446.20M | 113 |
| 25 | PAUL, WEISS, RIFKIND, WHARTON & GARRISON | $441.61M | 13 |

26. Plaintiff provided defendants with all the materials and information that he possessed relevant to the sale of the apartment.

**The Sale of the Apartment**

27. On June 19, 2022, plaintiff signed a contract to sell the apartment to Peter Foster.

28. Under the terms of the contract, Wexler & Kaufman agreed to act as escrowee for the transaction and to hold certain purchase funds in escrow in their attorney trust account.

29. On June 21, 2022, the buyer made a wire transfer of $183,000 from his account to the Wexler & Kaufman attorney trust account for the contract deposit.

30. The sale went to closing on August 22, 2022.

31. Plaintiff was in London on that date and Evan Teich attended the closing with full power of attorney to act on plaintiff's behalf.

32. On the day of the closing, the buyer's attorneys (Giddins Claman LLP) wired $359,552.98 to the Wexler & Kaufman IOLA for the balance of the purchase price.

33. After the closing, at approximately 1:22 pm (NY time), Teich sent plaintiff an e-mail (copied to plaintiff's wife, Wexler, and Wexler & Kaufman paralegal Dora Sagdullaev) advising that the sale had closed and providing plaintiff with closing documents. Teich also asked plaintiff for wire instructions:

> **From:** **Evan Teich** eteich@wlklegal.com
> **Subject:** RE: 22 Renwick St 7B
> **Date:** 22 August 2022 at 18:22
> **To:** Carl Bonde [redacted]
> **Cc:** Dora Sagdullaev dsagdullaev@wlklegal.com, Brett Wexler bwexler@wlklegal.com, Zena Bentzen Bonde [redacted]
>
> ET
>
> Hi Carl,
>
> We are officially closed! Congrats on your sale!!
>
> Attached please find copies of the closing documents signed today as well as the updated closing statement. Let us know if you have any additional questions
>
> Please send us your wire instructions so we can get you your funds as soon as possible. Thanks!
>
> Evan Teich, Esq.
> **Wexler & Kaufman, PLLC**
> One Penn Plaza, Suite 3406 | New York, NY 10119
> ETeich@wlklegal.com | www.wlklegal.com
> 516-754-6470 - Direct
> 646-558-0527 - Fax
>
> WEXLER & KAUFMAN PLLC
>
> This message is intended only for the use of the individual or entity to which it is addressed, and contains information that is privileged, confidential, and may be exempt from disclosure under applicable law. If the reader of this message is not tl
> Nonetheless, the information contained herein is intended for the receiving party and the contents contained herein or in any attachment should be considered proprietary and confidential. If you have received this communication in error, please
>
> ***With cyber-crimes on the rise, it is important to be ever-vigilant. If you receive an email, or any other communication that appears to be generated from our oj seldom change.***

34. The closing statement provided by Mr. Teich confirms that the contract deposit and closing balance payments were received to the Wexler & Kaufman trust account.

35. Wexler & Kaufman paid itself $5,550.00 in legal fees from the sale proceeds in its trust account.

36. According to the closing statement, after paying legal fees, the title bill, the broker's commission, and other closing costs, there were $427,872.37 in net sale proceeds remaining in the Wexler & Kaufman trust account to be paid to plaintiff:

| CHECKS/WIRES FROM ESCROW: | | | |
|---|---|---|---|
| Contract Deposit in Escrow: | $183,000.00 | | |
| Wire from Buyer for Balance of Sale | $359,552.98 | | |
| *TOTAL FUNDS AVAILABLE IN ESCROW:* | $542,552.98 | | |
| Wexler & Kaufman, PLLC | $5,550.00 | Legal Fee + POA + Closing Doc Prep + NYC ACRIS Recording Fee + Closing Notary Fee + FedEx/Courier | |
| Madison Title Agency | $34,430.61 | Title Bill | |
| TBD | $250.00 | Closer Pick Up Fee | |
| T.W. Lewis & Co., LLC | $1,250.00 | Tax Attorney Fee | |
| Serhant | $73,200.00 | Broker Commission (4%) | |
| Carl Bonde | $427,872.37 | Sale Proceeds | (total funds in escrow |

37. Plaintiff responded at 2:02 pm (NY time) by e-mail (again copying Wexler as well as Sagdullaev) and gave Teich the wire instructions for his bank account:

From: Carl Bonde
Subject: Re: 22 Renwick St 7B
Date: 22 August 2022 at 19:02
To: Evan Teich eteich@wlklegal.com
Cc: Dora Sagdullaev dsagdullaev@wlklegal.com, Brett Wexler Bwexler@wlklegal.com, Zena Bentzen Bonde

That's great and thanks for the help.

My wire details are:

Bank:
Routing number:
Account number:

Many thanks,
Carl

**The Diversion of the Sale Proceeds**

38. Upon information and belief, the Wexler & Kaufman firm did not employ adequate security measures to protect its confidential and sensitive data or plaintiff's interests in the sale transaction. Defendants did not have an adequate cybersecurity program, did not have an adequate cybercrime prevention program, did not have policies or procedures or practices in

place to prevent email based funds transfer frauds (known as business email compromise), did not follow acceptable practices for cybersecurity and cybercrime prevention during these events, did not comply with New York State attorney professional responsibilities for cybersecurity, cybercrime prevention, and cybercrime investigation, did not comply with NYS General Business Law 899-aa and 899-bb (the "SHIELD Act") regarding cybersecurity and breach notification.

39.     Because of these failures, a cybercriminal learned of the transaction and gathered enough specific information to enable them to impersonate plaintiff and his wife on the day of the closing in emails to defendants in order to divert the sale proceeds. This type of fraud is sometimes called business email compromise (BEC), CEO fraud, or email based funds transfer frauds.

40.     On August 22, 2022 at approximately 11:20 am (NY time), a person fraudulently portraying themself to be Zena Bentzen Bonde, plaintiff's wife, sent an email to Wexler inquiring as to whether the closing was taking place and asking for an update.

41.     The fraudulent email came from an email address different from the actual email address used by Zena Bentzen Bonde in earlier communications with Wexler about the transaction. Defendants failed to detect the fraudulent email.

42.     The fraudulent 11:20 am email purported to copy plaintiff at the fraudulent email address of carl.bonde@rn-e.net. Plaintiff had no connection with this email address and had used different email addresses to communicate with defendants.

43.     At approximately 11:45 am, Wexler received another email, this time from a cybercriminal fraudulently portraying themself to be plaintiff, requesting an update on the

closing. This fraudulent email was not in the chain of previous emails exchanged with plaintiff and went to Wexler's spam folder. Wexler did not notice that the fraudulent emails were from different email addresses than had been previously used by plaintiff and his wife.

44.     At approximately 2:34 pm (NY time), Wexler responded to the cybercriminal's email and stated that he had found the 11:45 am email in his spam folder and advised the cybercriminal that the sale had closed. Within a minute, the cybercriminal responded by email and asked for an update on when the sales proceeds would be sent out so that they could provide the bank information.

45.     Even though he had been copied on plaintiff's email at 2:02 pm (NY time) with bona fide wire instructions, Wexler continued to communicate with the cybercriminal to request additional wire instructions.

46.     At approximately 2:44 pm (NY time), Wexler responded to the cybercriminal's email and requested wire instructions, apparently oblivious to the fact that he had received legitimate wire instructions from plaintiff earlier.

47.     At approximately 3:53 pm (NY time), nearly two hours after defendants had received legitimate wire instructions from plaintiff for his actual account at HSBC, the cybercriminal sent wire instructions for a Barclays account purportedly held in plaintiff's name. Plaintiff had no connection with the Barclays account.

48.     Despite receiving conflicting wires instructions from different email addresses, defendants did not take any steps to compare the email addresses or wire instructions. Most important, defendants neither sought nor received verbal confirmation of the wire instructions from plaintiff. If they had sought verbal confirmation, as they should have, they would have

realized which instructions were genuine, which were fraudulent, and would have realized criminal activity was afoot.

49. As a result, defendants wired the net sale proceeds in the amount of $427,872.37 to the Barclays account identified in the cybercriminal's email. Plaintiff never received the money from the sale of his apartment.

**Plaintiff Learns of the Fraud and Defendants Falsely Provide Assurances**

50. Defendants sent plaintiff an e-mail at approximately 5:06 pm (NY time – 10:06 pm London time) claiming that the wire had been sent. The wire, however, was not sent to plaintiff's bank account.

51. Rather, the confirmation provided by Wexler referenced a Wells Fargo account with no connection to plaintiff:

From: Brett Wexler bwexler@wlklegal.com
Subject: RE: 22 Renwick St 7B
Date: 22 August 2022 at 22:06
To: Carl Bonde [redacted] Evan Teich eteich@wlklegal.com
Cc: Dora Sagdullaev dsagdullaev@wlklegal.com, Zena Bentzen Bonde [redacted]

Wire is out!

Please save this email as confirmation of your recent wire transfer. If you believe this transaction to be in error or fraudulent, please contact (866) 340-9473 immediately.

TRANSACTION NUMBER: 2022082200006486 REPORT DATE:
STATUS: COMPLETE COMPLETION TIME:
DEBIT:

CREDIT PARTY
ACCOUNT NUMBER: 0750064302/
NAME: WELLS FARGO INTL USD
ADDRESS: NEW YORK
NEW YORK

DEBIT PARTY
ACCOUNT NUMBER:
NAME:
ADDRESS:

RECEIVING PARTY (BENEFICIARY CUSTOMER)
RECEIVER NAME: CARL ULFSSON BONDE
RECEIVER ADDRESS:
ACCOUNT ID: GB09BUKB20203775574811
RECEIVING BANK:

ORIGINATOR TO BENEFICIARY INFORMATION:
BALANCE OF SALE PROCEEDS

Brett Wexler, Esq.

Wexler & Kaufman, PLLC
One Penn Plaza, Suite 3406 | New York, NY 10119
BWexler@wlklegal.com | www.wlklegal.com
516-728-6444 – Cell Phone (BEST TO CALL)
646-561-4758 - Direct
646-558-0527 - Fax

52. Plaintiff has no connection with the Wells Fargo accounts referenced in the Wexler & Kaufman wire confirmation.

53. Plaintiff notified defendants by email on August 23, 2022 stating that he thought he had "received some hacked email from you guys".

54. Wexler responded, "No this is our confirmation that a wire has gone out".

55. Plaintiff responded and requested that the attorneys to call him, "Can someone call me ASAP. I think something is wrong."

56. Wexler responded with an e-mail stating "you seem to be panicking, nothing is wrong" and that Mr. Bonde would be receiving two wires for over $787,000:

From: Brett Wexler bwexler@wlklegal.com
Subject: RE: 22 Renwick St 7B
Date: 23 August 2022 at 16:59
To: Carl Bonde
Cc: Evan Teich eteich@wlklegal.com, Dora Sagdullaev dsagdullaev@wlklegal.com, Zena Bentzen Bonde

Carl, I cannot make international calls and I am not sure why you seem to be panicking, nothing is wrong

You are getting two wires

One was sent yesterday for $427,872.37 and one was sent today for $359,552.98

If you see our statement attached, that is the balance of proceeds.

Brett Wexler, Esq.

**Wexler & Kaufman, PLLC**
One Penn Plaza, Suite 3406 | New York, NY 10119
BWexler@wlklegal.com | www.wlklegal.com
516-728-6444 – Cell Phone (BEST TO CALL)
646-561-4758 - Direct
646-558-0527 - Fax

This message is intended only for the use of the individual or entity to which it is addressed, and contains information that is privileged, confidential, and may be exempt from disclosure under applicable law. If the reader of this message is not t contained herein is intended for the receiving party and the contents contained herein or in any attachment should be considered proprietary and confidential. If you have received this communication in error, please notify the sender at 646-558

57. Wexler's email was wildly incorrect and demonstrates that he was uninformed about the transaction. For example, the amounts referenced in Wexler's e-mail far exceed the net proceeds due to plaintiff and plaintiff never received any wire transfers, let alone two.

58. On August 23, 2022, at approximately 6:01 pm (NY time), Wexler sent an e-mail stating that the fraudulent wire was being "recalled":

From: Brett Wexler bwexler@wlklegal.com
Subject: RE: You have received an encrypted message
Date: 23 August 2022 at 18:01
To: HARDMAN, VALERIE Valerie.Hardman@firsthorizon.com, Marc Kaufman mkaufman@wlklegal.com, Evan Teich eteich@wlklegal.com, Dora Sagdullaev dsagdullaev@wlklegal.com, Aleksandr Dzyuba adzyuba@whenitmatters.nyc, ARMAO, JOSEPH P. Joseph.Armao@firsthorizon.com
Cc: MT Manhattan Client Service MTManhattanClientService@firsthorizon.com, Carl Bonde [redacted] Zena Bentzen Bonde [redacted]

Hi all, our clients are on copy here

Carl and Zena our banking team is here

The wire is being recalled and a new wire will be sent out to your [redacted] account

However, before that is done I would like for you to connect with Valerie to verify your account details

FYI, since this is an international wire it will take a couple of days to reach you

Brett Wexler, Esq.

59. The Wexler 6:01 pm email gave false assurances that the wire was in fact being recalled.

60. The fraudulent wire was not recalled and plaintiff never received any of the proceeds from the sale of his apartment.

61. Further, defendants continued to assure plaintiff over the next several days that they were handling the matter and that the sale proceeds would be wired to him. Plaintiff believed these assurances and allowed defendants to proceed with the wire recall and to re-transfer the funds.

62. Defendants, however, delayed investigating the loss of funds during the crucial time period immediately after the loss of the money. They never advised plaintiff of the conflict of interest created by their sending plaintiff's funds to a cybercriminal and they delayed notifying the FBI until August 31 – ***nine days*** after the loss of the funds.

63. Plaintiff has repeatedly requested that defendants replace the funds they wired to the wrong account or at least provide information to enable plaintiff to track down the funds. For example, plaintiff has requested that defendants provide the fraudulent emails defendants claim to have received so that the cybercriminals can be identified. Defendants have refused.

64. Plaintiff has suffered damages in the amount of $427,832.37 for the loss of the sale proceeds. Plaintiff is also entitled to the refund of all legal fees paid to defendants.

**First Cause of Action for Legal Malpractice**

65. Plaintiff repeats and re-alleges all the preceding paragraphs of this Complaint as though fully set forth herein.

66. Plaintiff retained defendants to represent and advise him as his attorneys in connection with the sale of his apartment.

67. Plaintiff paid defendants for their legal services.

68. Defendants acted as plaintiff's attorneys in these matters beginning in June, 2022 and on a continuous basis thereafter through at least August 23, 2022.

69. Throughout this period, plaintiff continued to repose confidence in defendants and in their ability and good faith, and there was continuing trust and confidence in the relationship between plaintiff and defendants.

70. In accepting the representation, defendants expressly or impliedly agreed to comply with their professional obligations under the New York Rules of Professional Conduct.

71. As attorneys for plaintiff, defendants owed him a duty to render legal services in a competent and professional manner and to act with ordinary and reasonable skill, care, and diligence.

72.     Defendants also had a fiduciary duty to protect their client's funds, and to insure, as far as reasonably possible, the safe transfer of the sale proceeds to plaintiff. Defendants had a further duty to protect the integrity of their client files and the confidentiality of documents, communications, and information relating to the sale transaction.

73.     Defendants acted with gross negligence under the circumstances, failed to provide adequate legal services in accordance with generally accepted standards of the legal profession, and failed to act with ordinary and reasonable skill, care, and diligence.

74.     The defendant attorneys' gross negligence consisted of, among other things, failing to safeguard information relating to plaintiff's transaction; failing to maintain confidentiality of plaintiff's documents and communications relating to the sale transaction; allowing a cybercriminal to gain access to information about plaintiff's transaction; failing to confirm email addresses on emails relating to the transaction; failing to identify emails from a cybercriminal impersonating plaintiff and his wife; failing to follow plaintiff's wire instructions; failing to realize that they had receive fraudulent emails and wire instructions from a cybercriminal impersonating plaintiff and his wife; failing to verbally confirm wire instructions for plaintiff's account; failing to realize they had received conflicting wire instructions; failing to communicate within Wexler & Kaufman about the transaction; failing to confirm plaintiff's receipt of the wire transfer; failing to maintain contact with plaintiff; failing to follow up timely to halt or recall the wire transfer before the funds were irretrievably lost; failing to employ adequate security protocols, including email and data security; failing to safeguard funds entrusted to them in plaintiff's transaction; failing to have reasonable cybersecurity and cybercrime prevention program, policies, procedures, practices, and training, as required by the

Rules of Professional Responsibility and the New York State SHIELD Act; failing to advise

plaintiff with respect to the escrow provisions of contract of sale; failing to advise plaintiff to

retain independent counsel with respect to the escrow provisions of contract of sale; failing to

provide legal representation in accordance with the standards of professional services consistent

among attorneys in this community; delaying investigation into the loss of plaintiff's funds;

delaying the notification of law enforcement about the loss of plaintiff's funds; failing to

represent plaintiff's interests properly; failing to adequately supervise the work of inexperienced

attorneys; failing to adequately supervise the work of non-attorney staff; failing to research and

know the law as it related to plaintiff's matter; failing to represent plaintiffs diligently; and

failing to advise plaintiffs properly.

75.     As a result of the wrongdoing alleged in this Complaint, defendants also breached

the duty of care they owed to plaintiff and violated the New York Rules of Professional Conduct,

including, but not limited to, the following Rules:

(i)     Rule 1.1(a) - by failing to provide competent representation to plaintiff;

(ii)    Rule 1.1(c)(1) – by failing to seek plaintiff's objectives through reasonably available means permitted by law;

(iii)   Rule 1.1(c)(1) – by prejudicing and damaging the plaintiff during the course of the representation;

(iv)    Rule 1.3(a) – by failing to act with reasonable diligence and promptness in representing plaintiff;

(v)     Rule 1.3(b) – by neglecting plaintiff's matter;

(vi)    Rule 1.4(a)(1)(iii) – by failing to promptly inform plaintiff of material developments in the matter;

(vii)   Rule 1.4(a)(3) – by failing to keep plaintiff reasonably informed about the status of the matter;

(viii)    Rule 1.4(a)(4) – by failing to promptly comply with plaintiff's reasonable requests for information;

(ix)    Rule 1.4(b) – by failing to explain the matter to the extent reasonably necessary to permit plaintiff to make informed decisions regarding the representation;

(x)    Rule 1.6(a) – by revealing confidential information relating to the sale transaction without plaintiff's consent;

(xi)    Rule 1.6(c) – by failing to make reasonable efforts to prevent the inadvertent or unauthorized disclosure or use of, or unauthorized access to, information relating to the sale transaction;

(xii)    Rule 1.7 – by failing to advise plaintiff of the conflict of interest after the theft of the sale proceeds;

(xiii)    Rule 1.7 – by continuing to represent plaintiff after the theft of the sale proceeds when there was a significant risk that the lawyer's professional judgment on behalf of plaintiff would be adversely affected by the lawyer's own financial, business, property or other personal interests;

(xiv)    Rule 1.8 - by making an agreement purporting to prospectively limit defendant's liability to plaintiff for malpractice;

(xv)    Rule 1.9(b) - by failing to account to plaintiff for the sale proceeds entrusted to defendants;

(xvi)    Rule 1.9(c) - by failing to promptly pay plaintiff as requested the funds in defendants' possession hat plaintiff was entitled to receive;

(xvii)    Rule 5.1 – by failing to adequately supervise the work of associate attorneys; and

(xviii)    Rule 5.3 – by failing to adequately supervise the work of paralegals and other non-lawyers at the firm.

76.    Defendants' gross negligence and breach of their ethical duties to plaintiff was a proximate cause of plaintiff's damages as described above.

77.    Had defendants represented plaintiff properly, he would not have sustained the damages alleged in this Complaint.

78. By reason of the foregoing gross negligence of defendants, plaintiff has been damaged in the amounts described above and is also entitled to the disgorgement of all legal fees paid to defendants and prejudgment interest at the legal rate for each element of damages identified above from the dates indicated through the date of judgment herein.

79. The actions by defendants, specifically their willful failures described above, their violations of the Rules of Professional Conduct, were all intentional, outrageous, wanton, and malicious. Plaintiff is therefore also entitled to an award of punitive damages in an amount to be determined at trial.

80. Defendants' malpractice proximately caused plaintiff to be damaged in an amount to be determined at trial but believed to be in excess of $75,000.

**Second Cause of Action for Breach of Contract**

81. Plaintiff repeats and re-alleges all the preceding paragraphs of this Complaint as though fully set forth herein.

82. Defendants entered into an agreement with plaintiff to act as escrowee for certain apartment sale proceeds.

83. Plaintiff has performed all his obligations under the agreement.

84. Defendants have breached the agreement by reason of their gross negligence described above in failing to safeguard and deliver the net sale proceeds to plaintiff.

85. Defendants acted in bad faith and in in willful disregard of their duties under the contract.

86. Defendants' breach has caused plaintiff to be damaged in an amount to be determined at trial but believed to be in excess of $75,000.

**Third Cause of Action for Conversion**

87. Plaintiff repeats and re-alleges all the preceding paragraphs of this Complaint as though fully set forth herein.

88. As set forth above, defendants exercised dominion and control over the funds in a manner that exceeded their authority. Specifically, defendants have refused to remit the net proceeds from the sale of the apartment to plaintiff despite multiple demands that they do so.

89. Based on the foregoing, defendants have converted plaintiff's property.

90. Defendants' conversion has caused plaintiff to be damaged in an amount to be determined at trial but believed to be in excess of $75,000.

WHEREFORE, plaintiff Carl Ulfsson Bonde respectfully requests that judgment be entered against defendants Wexler & Kaufman, PLLC, Brett Wexler, and Evan Teich, jointly and severally, awarding plaintiff: (i) compensatory damages in an amount to be determined at trial; (ii) punitive damages in an amount to be determined at trial; (iii) prejudgment interest, at the legal rate, from August 22, 2022 until the date of judgment herein; and (iv) such other and further relief as the Court deems just and proper, including attorneys' fees and the costs and disbursements of this action.

Dated: New York, New York
April 6, 2023

SCHWARTZ & PONTERIO, PLLC
*Attorneys for Plaintiff*

By: ____________________________

Matthew F. Schwartz
134 West 29th Street – Suite 1001
New York, New York 10001
Telephone: (212) 714-1200

**JURY DEMAND**

Plaintiff Carl Ulfsson Bonde demands a trial by jury on all issues so triable.

Dated: New York, New York
April 6, 2023

SCHWARTZ & PONTERIO, PLLC
*Attorneys for Plaintiff*

By: ______________________________
Matthew F. Schwartz
134 West 29th Street – Suite 1001
New York, New York 10001
Telephone: (212) 714-1200