UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARL ULFSSON BONDE,

     Plaintiff,

     -against-

WEXLER & KAUFMAN, PLLC, et al.,

     Defendants.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  12/8/2023
```

23-CV-2877 (JGK) (BCM)

**MEMORANDUM AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

The question now before the Court is whether defendants Wexler & Kaufman, PLLC (W&K), Brett Wexler, and Evan Teich are entitled to withhold from discovery, as privileged, 152 WhatsApp messages and two emails exchanged among various W&K personnel (and one outside vendor) between August 24 and August 31, 2022. For the reasons that follow, the Court answers that question in the negative and directs defendants to produce the communications.

## I.   BACKGROUND

W&K is a law firm in New York City. Compl. (Dkt. 1) ¶ 10; Ans. (Dkt. 19) ¶ 10. Plaintiff Carl Ulfsson Bonde is a citizen of Sweden who resides in London, England. Compl. ¶ 9. Bonde retained W&K in connection with the sale of his New York City condominium apartment. *Id*. ¶¶ 1, 18-19; Ans. ¶¶ 2, 19. W&K also agreed to act as escrowee for the transaction. Compl. ¶ 28; Ans. ¶ 28. The two W&K attorneys responsible for the Bonde matter were Wexler, a member of the firm, and Teich, an employee. Compl. ¶ 21; Ans. ¶¶ 13, 16. The sale closed on August 22, 2022, and W&K received the proceeds by wire into its attorney trust account. Compl. ¶¶ 29-32; Ans. ¶¶ 29-32. Attorney Teich attended the closing on Bonde's behalf. Compl. ¶ 31; Ans. ¶ 31.

After the closing, at 1:22 p.m.,[1] Teich sent his client an email (with copies to Wexler, W&K paralegal Dora Sagdullaev, and Bonde's wife Zena Bentzen Bonde), advising that the sale was

---

[1] In this Memorandum and Order, all time references are to New York time.

closed and asking for wire instructions, "so that we can get you your funds as soon as possible." Compl. ¶ 33. After W&K's legal fee, commissions, and other closing costs, the amount due to Bonde was $427,872.37. Compl. ¶¶ 35, 36. Plaintiff responded at 2:02 p.m. (also copying Wexler, Sagdullaev, and Bentzen Bonde), providing wire instructions for his account at HSBC. *Id*. ¶ 37.

Meanwhile, at 11:45 a.m. that same day, a "cybercriminal fraudulently portraying themself to be plaintiff" sent Wexler an email from a "spoofed" email address (that is, an address incorporating Bonde's name but slightly different from Bonde's actual email address), requesting an update on the closing. Compl. ¶ 43. The fraudulent email went to Wexler's spam folder, but Wexler found and responded to it at 2:34 p.m., advising that the sale had closed. *Id*. ¶ 44. Wexler continued to communicate with the cybercriminal, and at 2:44 p.m., he requested wire instructions, "apparently oblivious to the fact that he had [already] received legitimate wire instructions from plaintiff earlier." *Id*. ¶ 46. At 3:53 p.m., "the cybercriminal sent wire instructions for a Barclays account purportedly held in plaintiff's name." *Id*. ¶ 47.

According to plaintiff:

> Despite receiving conflicting wires instructions from different email addresses, defendants did not take any steps to compare the email addresses or wire instructions. Most important, defendants neither sought nor received verbal confirmation of the wire instructions from plaintiff. If they had sought verbal confirmation, as they should have, they would have realized which instructions were genuine, which were fraudulent, and would have realized criminal activity was afoot.

Compl. ¶ 48. Instead, without calling Bonde or taking any other steps to determine which set of wire instructions was correct, "defendants wired the net sale proceeds in the amount of $427,872.37 to the Barclays account identified in the cybercriminal's email." *Id*. ¶ 49.

At 5:06 p.m., Wexler sent an email to plaintiff (using his correct email address) confirming that the wire was sent. The next day, August 23, 2022, Bonde realized that something was amiss. Not only had he not received any funds; Wexler's confirmation email referenced a recipient bank

account that was not Bonde's bank account. Compl. ¶¶ 51-55. At 4:59 p.m., Wexler assured Bonde that "nothing is wrong." Compl. ¶ 56. An hour later, however, Wexler sent an email to the firm's "banking team" and to "our clients" Carl and Zena Bentzen Bonde, advising that "[t]he wire is being recalled and that a new wire would be sent to your [correct] account." *Id*. ¶ 58. W&K "continued to assure plaintiff over the next several days that they were handling the matter and that the sale proceeds would be wired to him." *Id*. ¶ 61. On this basis, Bonde "allowed defendants to proceed with the wire recall and to re-transfer the funds." *Id*. ¶ 61. However, W&K was unsuccessful in recalling the wire that went to the cybercriminal. Bonde "never received any of the proceeds from the sale of his apartment," *id*. ¶ 60, and W&K refused to replace the funds. *Id*. ¶ 63.

On April 6, 2023, plaintiff sued W&K, Wexler, and Teich for legal malpractice, breach of contract, and conversion. Compl. ¶¶ 65-90. Plaintiff seeks damages in the amount of $427,832.37, for the loss of the sale proceeds, along with a refund of the legal fees he paid to W&K. Compl. ¶ 64. The case has been referred to me for general pretrial management. (Dkt. 31.)

## II.    THE MOTION TO COMPEL

In a letter-motion dated October 9, 2023 (Dkt. 28), supplemented by a follow-up letter on October 24, 2023 (Dkt. 34), plaintiff sought various items of discovery-related relief, including an order directing defendants to produce 152 WhatsApp messages exchanged among Wexler, his law partner Marc Kaufman, and W&K paralegal Dora Sagdullaev between August 24 and 31, 2022, and two emails, both dated August 30, 2022, from Wexler to the firm's outside IT consultant, Aleksandr Dzyuba. The WhatsApp messages are described on defendants' privilege log simply as "Internal Firm Communication re Claim," and the emails are described as "Communication with IT Personnel." *See* Priv. Log (Dkt. 34 at ECF pp. 6- 15) (challenged items highlighted in yellow). However, during a discovery conference on October 30, 2023, defendants' counsel stated that, as

to each challenged document, defendants were relying solely on the attorney-client privilege. *See* Tr. of 10/30/23 Conf. (Tr.) (Dkt. 38) at 50:9-16. Counsel explained that the withheld communications were "communications where they're talking about their E&O [Errors & Omissions] exposure," and as such were "off limits" in discovery. *Id*. at 50:23-51:5. Counsel further asserted that both Wexler and Kaufman were acting as general counsel to their eponymous law firm when they created the withheld communications. *Id*. at 51:12-13; 53:7-8.

At the conference, I deferred decision on the privilege issue, to give defendants an opportunity to submit "admissible evidence establishing that the WhatsApp messages and emails they withheld as privileged are, in fact privileged," 10/30/23 Order (Dkt. 35) at 4-5, and directed them to do so by November 8, 2023. *Id*. at 5. I further directed defendants to submit ten of the challenged communications (half selected by defendants, half by plaintiff) for *in camera* review, *id*., and gave plaintiff a date to respond to defendants' evidentiary submission. *Id*.

On November 8, 2023, defendants submitted two affidavits, signed by Wexler and Kaufman, respectively, and the ten exemplar communications selected by the parties. *See* 11/8/23 Ltr. (Dkt. 37). In their affidavits, both members of W&K attest, in identical terms:

> In response to the information that the wire initiated by my office on August 22, 2022, related to the sale of the plaintiffs apartment did not reach its intended target, I immediately realized that the firm could be facing malpractice exposure as a result. I therefore assumed the role of general counsel to my firm for the purposes of protecting my firm from further exposure to liability, to effectuate timely and sufficient reporting to our errors and omissions insurance carrier, and also to coordinate the defense of the firm.
>
> My partner, [Marc Kaufman/Brett Wexler] also assumed the role of general counsel at the same time I did and for the same purpose. To that end, we had several discussions about this matter on behalf of the client, namely Wexler & Kaufman, PLLC, with employees Evan Teich, the attorney that handled the closing in question, Dora Sagdullaev, a paralegal with knowledge of the firm's policies and procedures regarding wiring funds, as well as the firm's dedicated Information Technology Vendor Aleksander Dzyuba.

The aforementioned communications were confidential, made pursuant to the attorney client privilege, and were made for the purpose of providing and seeking legal advice.

Wexler Aff. (Dkt. 37 at ECF pp. 3-4) ¶¶ 3-5; Kaufman Aff. (Dkt. 37 at ECF pp. 5-6) ¶¶ 3-5.

### A.   The Exemplar Communications

Four of the five exemplars submitted by defendants post-date August 31, 2022, and thus are not among the communications challenged by plaintiff.[2] The fifth, identified as Wexler PRIV 00168-00175, is a string of WhatsApp messages exchanged between Wexler and Kaufman on August 24, 2022 – two days after W&K sent Bonde's money to the cybercriminal's bank account. In those messages, Wexler and Kaufman discuss the events of the past two days, including the wire transfer itself, the prospects for successfully recalling it, and Wexler's post-wire interactions with "the clients," meaning the Bondes, their real estate brokers, and the law firm's bankers. These exchanges are interspersed with comments regarding other matters, some of them personal and some concerning unrelated firm business. Nowhere in the string, however, is there any direct discussion of the firm's potential malpractice liability or E&O reporting obligations, and at no point does either Wexler or Kaufman request or provide any legal advice or analysis. Neither of them indicates, anywhere in the conversation, that he is acting as counsel to the firm.

All five of the exemplars selected by plaintiff are dated between August 24 and August 31, 2022. Wexler PRIV 00001-00004 and Wexler PRIV 00005-00008 are the two emails from Wexler to Dzyuba, both dated August 30, 2022. In each email, Wexler simply forwards to Dzyuba an

---

[2] Defendants submitted Wexler PRIV 00205-00207, Wexler PRIV 00168-00175, Wexler PRIV 00148-00153, Wexler PRIV 00119-00123, and Wexler PRIV 00065-00069. *See* 11/8/23 Ltr. at 1. Of those, only Wexler PRIV 00168-00175 is dated prior to September 1, 2022 and highlighted (by plaintiff) on defendants' privilege log to indicate that the claim of privilege is being challenged. *See also* Pl. 11/15/23 Ltr. (Dkt. 41) at 2 (reaffirming that plaintiff "seeks only communications involving Wexler that occurred between August 24-31, 2022, all within a week of the misdirected wire transfer and while Wexler was still advising plaintiff").

email from Bonde to Wexler received earlier that same day. There are no requests, comments, or other text in the forwarding emails.

Wexler PRIV 00176-00179 is a string of WhatsApp messages exchanged between Wexler and paralegal Sagdullaev on August 24, 2022. As in Wexler PRIV 00168-00175, the conversation ranges over a number of topics, some personal and some related to W&K clients other than Bonde. At times, however, Wexler and Sagdullaev discuss "the carl bonde stuff," including the conduct of defendant Teich and the prospects for recalling the wire. At one point in the conversation, Sagdullaev explains her own process for "calling people and double checking info," but there is no indication that she was asked about, or was attempting to describe, "the firm's policies and procedures regarding wiring funds." Nor is there any direct discussion, anywhere in the string, of the firm's potential malpractice liability or E&O reporting obligations. At no point does Wexler provide any legal advice or analysis. Nor does he indicate, anywhere in the conversation, that he is acting as counsel to the firm.

Wexler PRIV 00184-00189 is a string of WhatsApp messages exchanged between Wexler and Sagdullaev on August 29, 2022. For the most part, the participants discuss what appears to be an unrelated real estate matter that the firm was handling for another client. At one point, however, Sagdullaev inquires as to whether "Bonde is still unresolved," and, in reply, Wexler describes the stress he is experiencing due to that unresolved matter. Nowhere in the string is there any direct discussion of the firm's potential malpractice liability or E&O reporting obligations, and at no point does Wexler provide any legal advice or analysis. Nor does he indicate, anywhere in the conversation, that he is acting as counsel to the firm.

Finally, Wexler PRIV 00190-00196 is a string of WhatsApp messages exchanged between Wexler and Sagdullaev on August 30, 2022. Once again, the conversation ranges over a number

of topics, including personal matters, matters the firm was handling for other clients, and the still-unresolved Bonde matter. Once again, Wexler shares with Sagdullaev how stressful he finds the situation. He blames that stress in part on Kaufman, who – in Wexler's words – was "pissing me the f*** off" by "blaming me" for the situation. Wexler PRIV 00192. Additionally, Wexler and Sagdullaev discuss, in general terms, whether the firm's existing "system" was adequate and what could be done to improve it. As in the earlier communications, there is no direct discussion of the firm's potential malpractice liability or E&O reporting obligations, and at no point does Wexler provide any legal advice or analysis. Nor does he indicate, anywhere in the conversation, that he is acting as counsel to the firm.

## B.      Additional Briefing

On November 15, 2023, plaintiff submitted his letter-brief in response to the Wexler and Kaufman affidavits, arguing that they were too "conclusory" to discharge defendants' burden of demonstrating that the challenged communications are privileged. Pl. 11/15/23 Ltr. at 1-2. Plaintiff further contends that defendants are not entitled to invoke the attorney-client privilege to protect communications about plaintiff that occurred "while they were still representing plaintiff." *Id.* at 2. Plaintiff argues that once Bonde and the firm became potentially adverse (which, according to Wexler's affidavit, happened "immediately" after the firm sent the mistaken wire, when he "realized that the firm could be facing malpractice exposure," Wexler Aff. ¶ 3), Wexler could not – consistent with his ethical duties – simultaneously represent both. Pl. 11/15/23 Ltr. at 2 (citing *Bank Brussells Lambert v. Credit Lyonnais (Suisse)*, 220 F. Supp. 2d 283 (S.D.N.Y. 2002)). Plaintiff adds that even if W&K's intra-firm communications are privileged, the privilege would not extend to emails from Wexler to the firm's external IT consultant, Dzyuba, particularly when those emails were sent on the same day that Wexler conducted a conference call with Bonde "about

trying to get the money back," *id*. at 3, suggesting that the purpose of the communications was to advance that goal – for Bonde's benefit – rather than to protect the firm *against* Bonde.

Finally, on November 21, 2023, defendants submitted a sur-reply letter-brief (with the Court's permission, *see* Dkt. 43), asserting that the Wexler and Kaufman affidavits adequately "detail the actual steps taken by the firm" following the events of August 22, 2022, and arguing that the affidavits, coupled with the exemplars themselves, "undoubtedly show that the withheld communications were for the purpose of obtaining and providing legal advice with regard to protecting the firm from further exposure to liability." Def. 11/21/23 Ltr. (Dkt. 44) at 1. Responding to plaintiff's conflict-of-interest argument, defendants assert that the firm's representation of Bonde "ceased at the closing," *id*. at 2, and that even if it did not, the attorney-client privilege between a law firm and its "in house" counsel "is not subject to a fiduciary or current-client exception[.]" *Id*. (quoting *Genesis Merchant Partners, LP v. Gilbride, Tusa, Last & Spellane LLC*, No. 653145/14, 2021 WL 305780, at *7 (N.Y. Supr. Ct., N.Y. Co. Jan. 28, 2021)).

## III.   STANDARDS

"State law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. Thus, "[i]n diversity cases such as this, where state law governs the claims, the Court looks to state law for determining privilege." *Kleeberg v. Eber*, 2019 WL 2085412, at *6 (S.D.N.Y. May 13, 2019) (collecting cases). "The elements of the attorney-client privilege under New York law are the existence of an attorney-client relationship, a communication made within the context of that relationship for the purpose of obtaining legal advice, and the intended and actual confidentiality of that communication." *Bowne of New York City, Inc. v. AmBase Corp.*, 161 F.R.D. 258, 264 (S.D.N.Y. 1995) (citing *People v. Osorio,* 75 N.Y.2d 80, 84, 550 N.Y.S.2d 612, 614-15 (1989)); *see also* N.Y. C.P.L.R. § 4503(a)(1).

### A.    The Proponent of the Privilege Bears the Burden

The purpose of the attorney-client privilege is "to ensure that one seeking legal advice will be able to confide fully and freely in his attorney, secure in the knowledge that his confidence will not later be revealed to the public to his detriment or his embarrassment." *People v. Mitchell*, 58 N.Y.2d 368, 373, 448 N.E.2d 121, 123 (1983). However, "[b]ecause the privilege shields from disclosure pertinent information and therefore 'constitutes an "obstacle" to the truth-finding process,' it must be narrowly construed." *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 27 N.Y.3d 616, 624, 36 N.Y.S.3d 838, 842 (2016) (quoting *Matter of Jacqueline F.*, 47 N.Y.2d 215, 219, 417 N.Y.S.2d 884, 886 (1979)). Consequently, "[t]he party asserting the privilege bears the burden of establishing its entitlement to protection by showing that the communication at issue was between an attorney and a client for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship, that the communication is predominantly of a legal character, that the communication was confidential and that the privilege was not waived." *Ambac*, 27 N.Y.3d at 624, 36 N.Y.S.3d 838, 842-43 (internal quotation marks omitted). "This burden can be met only by an evidentiary showing based on competent evidence . . . and cannot be 'discharged by mere conclusory or ipse dixit assertions.'" *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 470 (S.D.N. Y. 1993) (quoting *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 146 (2d Cir. 1987)).

### B.    Existence of the Attorney-Client Relationship

Where there is no written agreement or other documentary evidence clearly establishing that existence of the necessary attorney-client relationship, the court must consider "the words and actions of the parties to ascertain if an attorney-client relationship was formed." *C.K. Indus. Corp. v C.M. Indus. Corp.*, 213 A.D.2d 846, 848, 623 N.Y.S. 2d 410, 411 (3d Dept 1995); *see also Theroux v. Resnicow*, 72 Misc. 3d 1205(A), 147 N.Y.S.3d 892 (N.Y. Supr. Ct., N.Y. Co. 2021)

(holding that law firm partner failed to establish that he became the firm's client when he discussed a "personal legal matter" with two junior lawyers at the firm and used them for "free background research"). An attorney's conclusory statement that a party was his or her client is insufficient to demonstrate the relationship. *See Priest v. Hennessy*, 51 N.Y.2d 62, 70, 409 N.E.2d 983, 987 (1980) ("[I]ndependent facts beyond the attorney's statements must be shown in order to demonstrate the existence of an underlying attorney-client relationship upon which a claim of privilege could be based."); *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 2020 WL 757840, at *7 (S.D.N.Y. Feb. 14, 2020) ("[T]he existence of the required attorney-client relationship generally must be proved by something more than the attorney's claim that such a relationship existed.").

### C.   Character of the Communications

"Even where an attorney-client relationship exists, the client may not reflexively withhold every communication with its attorney as privileged." *Charlestown Cap. Advisors,* 2020 WL 757840, at *4. "In order to make a valid claim of privilege, it must be shown that the information sought to be protected from disclosure was a 'confidential communication' made to the attorney for the purpose of obtaining legal advice or services." *Priest*, 51 N.Y.2d at 69, 431 N.Y.S.2d at 514 (quoting *Matter of Jacqueline F.*, 47 N.Y.2d at 219). Ultimately, "it is the nature of the communication that controls." *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 129-30 (N.D.N.Y. 2007). If the communication itself is not "primarily or predominantly of a legal character," it cannot be withheld as privileged. *Spectrum Sys. Int'l Corp. v. Chemical Bank*, 78 N.Y.2d 371, 377-78, 581 N.E.2d 1055, 1066 (1991); *see also NXIVM Corp.*, 241 F.R.D. at 131 (in order to receive the protection of the attorney-client privilege, "the predominant purpose of the specific communication" must be "to seek legal advice").

### D.  As Applied to Communications with In-House Counsel

When the attorney-client privilege is invoked by a corporation or other business entity, it applies to communications with "corporate staff counsel" as well as with outside counsel. *Rossi v. Blue Cross & Blue Shield of Greater New York*, 73 N.Y.2d 588, 592, 540 N.E.2d 703, 704-05 (1989). However, "difficult questions may arise" in such circumstances, because in-house counsel often have "mixed business-legal responsibility" which can "blur the line between legal and non-legal communications." *Id.* at 592, 540 N.E.2d at 705. Hence, "the need to apply [the attorney-client privilege] cautiously and narrowly is heightened in the case of corporate staff counsel, lest the mere participation of an attorney be used to seal off disclosure." *Id.* at 593, 540 N.E.2d at 705. In such cases, the court must carefully scrutinize the relevant communications to ensure that they are "primarily or predominantly of a legal character." *Spectrum Sys.*, 78 N.Y.2d at 379, 581 N.E.2d at 1061 ("The critical inquiry is whether, viewing the lawyer's communication in its full content and context, it was made in order to render legal advice or services to the client." (citation omitted)); *see also Charlestown Cap. Advisors,* 2020 WL 757840, at *1-4 (concluding, after an *in camera* review, that various communications to and from individuals allegedly acting as Charlestown's in-house counsel could not be withheld from discovery because, *inter alia*, they were not "primarily or predominantly of a legal character"); *Saran v. Chelsea GCA Realty P'ship, L.P.*, 174 A.D.3d 759, 760-61, 104 N.Y.S.3d 698, 700 (2d Dep't 2019) (holding that emails with defendants' in-house counsel were not privileged, because they "relate to the business of the defendants, rather than legal issues, and nothing stated by in-house counsel in the emails sets him apart as a legal advisor in the discussion").

### E.      As Applied to Communications with In-House Counsel for Law Firms

When the business entity invoking the privilege is a law firm, and it seeks to withhold its internal communications from its own client, additional complications arise, particularly where the firm was still representing the client at the time of those communications.

#### 1.      Fiduciary Exception

New York recognizes the "fiduciary exception," under which a trustee or other fiduciary may not invoke the attorney-client privilege to block a beneficiary from discovering legal advice that the fiduciary obtained on behalf of that beneficiary. "The theory is that when a trustee seeks legal advice in executing his or her fiduciary duties, he or she is acting ultimately on behalf of the beneficiaries of the trust and, accordingly, cannot cloak his or her actions from them, the attorney's 'real clients[.]'" *Nama Holdings, LLC v. Greenberg Traurig LLP*, 133 A.D.3d 46, 53, 18 N.Y.S.3d 1, 7 (1st Dep't 2015). However, when the trustee seeks legal advice on his or her own behalf – for example, to prepare a defense to a claim of misconduct by a beneficiary – the trustee, rather than the beneficiary, is the "real client," the exception does not apply, and the privilege may not be invoked. *See*, *e.g.*, *Black v. Bowes*, 2006 WL 3771097, at *2 (S.D.N.Y. Dec. 21, 2006) (Lynch, J.) ("The privilege is maintained when fiduciaries retain counsel to defend themselves[.]"). In determining whether the attorney-client privilege or the fiduciary exception applies to a confidential, predominantly legal communication between a trustee and his or her counsel, the key question is "whether the 'real client' of the attorney rendering counsel was the fiduciary in his or her individual capacity or, on the other hand, the beneficiaries to whom the fiduciary duty was owed," *Stock v. Schnader Harrison Segal & Lewis LLP*, 142 A.D.3d 210, 219, 35 N.Y.S.3d 31 (1st Dep't 2016), and "the dispositive factor" in answering that question is "the purpose of the communication." *McFarlane v. First Unum Life Ins. Co.*, 231 F. Supp. 3d 10, 16 (S.D.N.Y. 2017).

Because "the burden of bringing the information sought within the privilege is upon the party asserting it," *Hoopes v. Carota*, 142 A.D.2d 906, 909, 531 N.Y.S.2d 407, 409 (1st Dep't 1988), *aff'd,* 74 N.Y.2d 716, 543 N.E.2d 73 (1989), fiduciaries who fail to establish that they consulted counsel "to defend themselves," *Black*, 2006 WL 3771097, at *2, rather than to advance their beneficiaries' interests, will be required to disclose the challenged communications. *See, e.g.*, *Hoopes*, 142 A.D.2d at 910, 531 N.Y.S.2d at 410 (compelling disclosure where trustee failed to establish that he solicited advice from counsel "solely in an individual capacity and at his own expense, as a defensive measure regarding potential litigation over his disputes with the trust beneficiaries").

Lawyers and escrowees, like trustees, are fiduciaries, whose fiduciary duties include safeguarding their clients' funds. *See In re Galasso*, 19 N.Y.3d 688, 694, 978 N.E.2d 1254, 1257 (2012) (respondent attorney was "bound to his clients" by a "fiduciary relationship" which included "the duty to safeguard client funds"); *Takayama v. Schaefer*, 240 A.D.2d 21, 25, 669 N.Y.S.2d 656, 659 (2d Dep't 1998) (escrowee has a "duty not to deliver the escrow to anyone except upon strict compliance with the conditions imposed," and if that duty is breached "can be held liable for breach of the escrow agreement and breach of fiduciary duty as escrowee") (quoting *Farago v. Burke*, 262 N.Y. 229, 233, 186 N.E. 683, 685 (1933)). Thus, an attorney who seeks advice from another attorney to assist in advancing the interests of the first attorney's client may not invoke the attorney-client privilege to prevent the client from discovering that communication. However, the fiduciary exception does not apply to lawyers who, "during their representation of a client, [seek] legal advice (whether from their firm's in-house counsel or outside counsel)

concerning issues of professional ethics or potential malpractice liabilities arising from the firm's representation of that client." *Stock*, 142 A.D.3d at 221, 35 N.Y.S.3d at 38.[3]

### 2.   Current Client Exception

In some jurisdictions, courts have held categorically that a law firm cannot invoke the attorney-client privilege against a current client to protect intra-firm consultations – even if the firm was the "real client" in those consultations – because the ethical rules prohibit both an individual attorney and all other attorneys at the same firm from simultaneously representing two clients with adverse interests (that is, the firm's client and the firm itself). *See*, *e.g.*, *Bank Brussels Lambert*, 220 F. Supp. 2d at 287-88 (since "[a]sserting the privilege against a current client seems to create an inherent conflict against that client," law firm "was under an ethical duty to disclose to [the client] the results of its internal conflict check and in no position to claim a privilege against their client"); *In re Sunrise Securities Litigation,* 130 F.R.D. 560, 597 (E.D. Pa. 1989) (a law firm's

---

[3] In *Stock*, the defendant law firm, SHS&L, represented Stock in negotiating a separation agreement from his former employer, Mastercard, and in a later arbitration against the administrator of Mastercard's Long Term Incentive Plan (LTIP) concerning the effect of that separation agreement on his right to exercise valuable Mastercard stock options. 142 A.D.3d at 213, 35 N.Y.S.3d at 33. Shortly before the arbitration hearing, the administrator notified SHS&L that it intended to call Carty (the SHS&L partner who negotiated the separation agreement) as a witness. *Id*. at 213-14, 35 N.Y.S. 3d at 33-34. Carty, together with the SHS&L litigators handling the arbitration, then consulted with "SHS&L's in-house general counsel," Kipnes, concerning "their and the firm's ethical obligations, in light of MSSB's demand for Carty's testimony, under the lawyer-as-witness rule." *Id*. at 213, 35 N.Y.S.3d at 34. "Kipnes never worked on any matter for plaintiff, and plaintiff was not billed for any of the time he devoted to the consultations with Carty and [the litigators]." *Id*. Stock later brought a malpractice action against SHS&L, alleging that Carty "failed to advise him that his termination would accelerate the expiration of his vested stock options under the LTIP." *Id*. at 215, 35 N.Y.S.3d at 34. The question before the Appellate Division was whether the firm was required to disclose, to its former client, the email communications among Kipnes, Carty, and the litigators prior to the arbitration hearing. *Stock* 142 A.D.3d at 215, 35 N.Y.S.3d at 35. The court held that the fiduciary exception did not apply to those emails, because "the purpose of the consultation with Kipnes – for whose time, to reiterate, plaintiff was not billed – was to ensure that the attorneys and the firm understood and adhered to their ethical obligations as legal professionals," such that "the attorneys and the firm, not plaintiff, were the 'real clients' in this consultation." *Id*. at 223, 35 N.Y.S.3d at 40.

communication with its own in-house counsel "is not protected by the attorney client privilege if the communication implicates or creates a conflict between the law firm's fiduciary duties to itself and its duties to the client seeking to discover the communication.").

In New York, however, the only appellate court to consider the question concluded that "the current client exception should not be adopted," *Stock*, 142 A.D.3d at 229, 35 N.Y.S.3d at 44, in large part because the court did not believe that the law firm's" in-house counsel, who never personally represented plaintiff on any matter, would have violated his ethical obligations by advising his colleagues within the firm on a matter as to which their interests, and those of the firm, conflicted with plaintiff's interest." *Id*. at 233, 35 N.Y.S.3d at 47. To be sure, Rule 1.10(a) of the New York Rules of Professional Conduct (RPC) bars all lawyers in a firm from representing "a client" if any one lawyer in that firm is conflicted out of the representation.[4] The *Stock* court, however, was persuaded by the reasoning of the Massachusetts Supreme Judicial Court in *RFF Fam. P'ship, LP v. Burns & Levinson, LLP*, 465 Mass. 702, 719, 991 N.E.2d 1066, 1078 (2013), that the term "client," as used in RPC 1.10(a), should not be interpreted "to include *the firm itself* when its interests conflict with those of a current outside client." *Stock*, 142 A.D.2d at 233, 35 N.Y.S.3d 47 (emphasis in original). Thus, the court concluded, as long as the firm's in-house counsel "never personally represented plaintiff on any matter," he did not violate RPC 1.10(a) "by advising his colleagues within the firm on a matter as to which their interests, and those of the firm, conflicted with plaintiff's interest." *Id*.; *see also Hertzog, Calamari & Gleason v. Prudential Ins. Co. of Am.*, 850 F. Supp. 255, 255 (S.D.N.Y. 1994) (within a law firm, "the privilege attaches to communications with in-house counsel if the individual in question is acting as an attorney,

---

[4] *See* 22 N.Y.C.C.R. § 1200.00, RPC 1.10(a) ("While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7, 1.8 or 1.9, except as otherwise provided therein.").

rather than as a participant in the underlying events."); *RFF Fam. P'ship*, 465 Mass. at 703, 991 N.E.2d at 1067-68 ("confidential communications between law firm attorneys and a law firm's in-house counsel concerning a malpractice claim asserted by a current client of the firm" may be withheld from the client, under a claim of privilege, if, among other things, "the in-house counsel has not performed any work on the client matter at issue or a substantially related matter").[5]

## IV.    ANALYSIS

### A.    W&K Represented Bonde Throughout August 31, 2022

I begin by rejecting defendants' claim that their representation of Bonde "ceased at the closing," which took place on the morning of August 22, 2022. Def. 11/21/23 Ltr. at 2. Not only is this statement facially implausible – given that defendants' duties included safeguarding and

---

[5] In *RFF Fam. P'ship*, the court set out four criteria, all of which must be met before a law firm may withhold an intra-firm communication from a current client under the attorney-client privilege:

> (1) the law firm has designated an attorney or attorneys within the firm to represent the firm as in-house counsel, (2) the in-house counsel has not performed any work on the client matter at issue or a substantially related matter, (3) the time spent by the attorneys in these communications with in-house counsel is not billed to a client, and (4) the communications are made in confidence and kept confidential.

465 Mass. at 703, 991 N.E.2d at 1067-68. *RFF Fam. P'ship* relied, in turn, on a scholarly article by a New York Law School professor, emphasizing that in order to avoid imputation of conflicts – and preserve the attorney-client privilege for communications with in-house law firm counsel – the in-house counsel must "individually [have] no conflict of interest under Rule 1.7 or Rule 1.9." Elizabeth Chambliss, *The Scope of in-Firm Privilege*, 80 Notre Dame L. Rev. 1721, 1748 (2005). Chambliss further recommended that courts carefully scrutinize the nature of the in-house counsel's role. "Where firm counsel holds a full-time position and does not represent outside clients, courts should not impute a conflict under Rule 1.10. This exception to imputation is justified by the structural segregation of the in-house position and the formal designation of the firm as firm counsel's only client." *Id*. At the other end of the scale, "Lawyers who act as firm counsel on a one-shot or ad hoc basis should be subject to imputation unless the firm can show that an attorney-client relationship was established before the in-firm communication occurred. In other words, in the absence of a formal 'firm counsel' position – or where firm counsel delegates matters to other lawyers in the firm – the burden should shift to the law firm to show that the identity and role of 'firm counsel' was clearly defined." *Id*. at 1749 (footnotes omitted).

transmitting the sale proceeds to Bonde, which could only occur *after* the closing – it was offered only in their sur-reply brief, with no evidentiary support. Defendants did not, for example, provide any evidence that either Bonde or the firm terminated the attorney-client relationship during the immediate post-closing period. To the contrary: the exemplar documents refer to the Bondes as W&K's "clients," *see* Wexler PRIV 00171, and contain numerous references to the ongoing communications between the firm and the Bondes (including through their real estate broker) concerning defendants' efforts to recall the wire so that the sale proceeds could be sent to plaintiff. Likewise, emails already produced in discovery show that the parties continued to discuss the recall efforts, including during a conference call on August 30, 2022, *see* Pl. 11/15/23 Ltr. Exs. 3-7 (Dkts. 41-3 through 41-7). These efforts, according to defendants, were designed to benefit "both Plaintiff and the Wexler firm." Def. 11/21/23 Ltr. at 2. I therefore find that Bonde was a current client of W&K between August 24 and August 31, 2022, when the allegedly privileged communications took place.

### B.   Defendants Have Not Established the Existence of an Attorney-Client Relationship with Either Wexler or Kaufman

Because New York has rejected the current client exception, the fact that Bonde remained a client of W&K throughout August 2022 does not – standing alone – prevent defendants from claiming that certain intra-firm communications during that period concerning "the carl bonde stuff" are subject to the attorney-client privilege. However, it significantly undercuts the foundation of that claim, which is that both Wexler and Kaufman "assumed the role of general counsel" to W&K "for the purposes of protecting my firm from further exposure to liability, to effectuate timely and sufficient reporting to our errors and omissions insurance carrier, and also to coordinate the defense of the firm." Wexler Aff. ¶ 3; Kaufman Aff. ¶ 3.

Wexler (unlike the in-house firm counsel in *Stock*) "personally represented plaintiff." 142 A.D.3d at 233, 35 N.Y.S.3d at 47. It was Wexler himself who received, and then acted on (or authorized others to act on) the fraudulent email providing wire instructions for an account controlled by the cybercriminal. Moreover, when Wexler realized that "the firm could be facing malpractice exposure," Wexler Aff. ¶ 3, he must also have realized that he was a likely defendant in any such suit. Therefore, Wexler could not represent W&K "to coordinate the defense of the firm," Wexler Aff. ¶ 3, without violating his ethical obligations to both clients: the firm and Bonde. *See* RPC 1.7(a)(1) (subject to exceptions inapplicable here, "a lawyer shall not represent a client if a reasonable lawyer would conclude that . . . the representation will involve the lawyer in representing differing interests[.]"); RPC 1.9(a) ("A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.").

While a violation of the ethical rules does not, standing alone, vitiate an otherwise available evidentiary privilege, *see Stock*, 142 A.D.3d at 232, 35 N.Y.S.3d at 46, I am loathe to conclude that Wexler served as "general counsel" to his law firm, to "coordinate its defense" against Bonde while also working with Bonde to recover his sale proceeds – in other words, that he did in fact violate RPC 1.7 – without compelling evidence. There is no such compelling evidence in the record. Indeed, defendants submitted *no* evidence on this fundamental point beyond the conclusory affidavits of Wexler and his law partner Kaufman, both of whom claim, in identically vague terms, to have "assumed" the "role" of in-house counsel on an unspecified date, immediately upon "realiz[ing] that the firm could be facing malpractice exposure." Wexler Aff. ¶ 3; Kaufman Aff. ¶ 3. New York law demands more. The existence of the attorney-client relationship upon which

the claim of privilege is based cannot be established "by mere conclusory or ipse dixit assertions." *Bowne*, 150 F.R.D. at 470. It must be supported by "independent facts beyond the attorney's statements[.]" *Priest*, 51 N.Y.2d at 70, 409 N.E.2d at 987; *accord Charlestown Cap. Advisors*, 2020 WL 757840, at *7. Those independent facts could – in theory – be supplied by the content of the privileged communications themselves, but in this case none of the exemplars (five of which were selected by defendants, presumably for maximum advantage) suggests that either Wexler or Kaufman was acting as counsel to the firm in August 2022.

On similar facts, the court in *Genesis Merchant Partners* rejected the Gilbride law firm's attorney-client privilege claim. Gilbride asserted that a partner in the firm, Last, was "appointed" in a "general counsel role" in March 2012, in connection with plaintiffs' then-anticipated malpractice claim, 2021 WL 305780, at *3, and on that basis withheld 15 internal firm documents as privileged. *Id.* at *3-4. Another partner, Wells, testified to the appointment at his deposition, but defendants offered "no other admissible evidence of Last's appointment," *id.* at *7, leaving the court with "serious concerns as to the existence of an appropriate 'attorney-client' relationship between Last and Gilbride." *Id.* Among the "other factors that cast that claim into doubt" was the fact that "between January and August 2012, Last billed hundreds of hours for his litigation efforts on the plaintiffs' behalf." *Id.* at *8. Moreover, after reviewing the allegedly privileged emails *in camera*, the court found "no indication that the Gilbride attorneys were seeking legal advice from Last, or that Last was providing any advice in his role as counsel to Gilbride." *Id.* These facts, the court noted, were "in stark contrast with *Stock*, where the appellate court repeatedly emphasized that the defendant law firm's general counsel had not performed any work for the plaintiff, did not bill any time to the plaintiff, and was not a participant in the underlying events." *Id.* Therefore, the court concluded, "the defendants have not met their burden of establishing that the [challenged]

emails . . . are protected by the attorney-client privilege because they have not demonstrated that Last acted as counsel to Gilbride in the context of the emails." *Id*. at *9.

Here too, the facts are "in stark contrast with *Stock*." As to Wexler, the record is clear that he personally represented plaintiff and was a central participant in the underlying events. As to Kaufman, the record is silent. Defendants do not disclose whether Kaufman ever personally represented plaintiff or billed any of his time to the Bonde matter. Defendants are not entitled to the benefit of the doubt on this issue, however, because it was their burden to show that they are entitled to claim the attorney-client privilege, including by demonstrating that neither individual identified as W&K's in house general counsel "personally represented plaintiff" or billed time to plaintiff's matter, *Stock*, 142 A.D.3d at 233, 35 N.Y.S.3d at 47, and by submitting admissible evidence, other than their own conclusory statements, to show that they were (or became) the firm's in-house general counsel before August 24, 2023, thus proving "the existence of the required attorney-client relationship." *Charlestown Cap. Advisors*, 2020 WL 757840, at *7.[6]

---

[6] These requirements have been well understood by the New York bar at least since *Stock* was decided in 2016. *See*, *e.g.*, Marian C. Rice, *Lawyers Need Confidential Advice*, N.Y. St. B.J., October 2018, at 14, 16 (because the likelihood of being able to protect the confidentiality of a lawyer's "casual discussion with co-workers or colleagues" is "slim," law firms should "designate an attorney within the firm as the in-firm General Counsel who should be the person of first resort when ethical or legal issues arise involving a client," should publicize the title and role "throughout the firm," and should note it "on the law firm's website."); Steve Merouse, *The Privilege Applied in-Firm*, Litigation, Summer 2019, at 23, 26–27 ("First, the communication must be with an in-firm lawyer who is acting on behalf of the firm and representing the firm's interests. Ideally, that person should be formally designated as the firm's general counsel, ethics counsel, or loss prevention counsel[.] . . . At a minimum, once a client dispute arises and you seek advice from another attorney at the firm, you will want to make clear – in writing – that the attorney represents the firm in that dispute. . . . Second, ensure that the lawyer acting as general counsel has not billed any time to the client or client matter that is the subject of the dispute. Where a firm has a full-time general counsel, this is typically not an issue. However, where the firm has a part time or ad hoc general counsel, it is important to ensure that the acting general counsel is not also working on matters for the client in question.").

In this case, for the reasons discussed above, defendants have not persuaded me that either Wexler or Kaufman formed an attorney-client relationship with W&K on or before August 31, 2022, for the purposes stated in their affidavits. Consequently, defendants' claim of attorney-client privilege cannot be sustained as to any of their intra-firm communications (much less as to their communications with the firm's outside IT consultant) during the relevant period.

### C.   The Challenged Communications are Not Primarily or Predominantly of a Legal Character

In order to make a valid claim of privilege, it is not enough to show that an attorney-client relationship existed. The proponent of the privilege must also show that the withheld communications are primarily or predominantly of a legal character. *Spectrum Sys.*, 78 N.Y.2d at 377-78, 581 N.E.2d at 1066; *accord Ambac*, 27 N.Y.3d at 624, 57 N.E.3d at 34-35 (proponent of privilege must establish "that the communication is predominantly of a legal character"); *Saran*, 174 A.D.3d at 760, 104 N.Y.S.3d at 700 ("The critical inquiry is whether the communications are primarily and predominately of a legal character and, in their full content and context, were made to render legal advice or services to the client."). Thus, in *Zloop, Inc. v. Phelps Dunbar LLP*, 2019 WL 1320542 (W.D. La. Mar. 22, 2019), it was not enough for the court to determine that the emails in question, which were exchanged between the Phelps Dunbar attorneys performing legal services for Zloop and Ralston, a member of the Phelps Dunbar Ethics Committee, concerned "ethical or professionalism issues involving the firm's joint representation of Zloop [and other clients]." 2019 WL 1320542, at *1-2. The court went on to "carefully review[]" each of the 17 challenged emails, and upheld the privilege only if the email "specifically reference[d] the conflict of interest and request[ed] legal advice from Mr. Ralston." *Id*. at *4. Emails containing factual information, forwarding non-privileged client communications, or concerning accounting issues, such as "the

collection of data regarding billing from the firm's accounting department," were ordered to be produced. *Id*. at *4-7.[7]

In this case, having reviewed all of the exemplars submitted to me (except for those post-dating August 31, 2022, which I do not understand to be at issue in this motion), I cannot make the necessary finding, because – even as to attorney Kaufman – there is no indication in any of those communications that "the [W&K] attorneys were seeking legal advice from [Kaufman], or that [Kaufman] was providing any advice in his role as counsel to [W&K]." *Genesis Merchant Partners*, 2021 WL 305780, at *8. Nor does anything else stated by Kaufman (or Wexler) in the exemplar communications "set[] him apart as a legal advisor in the discussion." *Saran*, 174 A.D.3d at 761, 104 N.Y.S.3d at 700.

To be sure, Kaufman discussed the Bonde matter with Wexler, and Wexler discussed it with Sagdullaev. Additionally, Wexler forwarded some of Bonde's emails to Dzyuba, the firm's IT consultant – likely for help in understanding how the incident occurred, and possibly with an eye towards preventing it from occurring again. But this cannot be sufficient for an invocation of privilege, as the same or similar discussions would undoubtedly take place among the owners, employees, and IT consultants of any small business in the wake of a similar crime. As in *Saran*, "[t]he defendants point to no particular communication in which in-house counsel gave legal advice, or in which the defendants' other employees sought legal advice from in-house counsel." 174 A.D.3d at 761, 104 N.Y.S.3d at 700. Consequently, for this reason as well, I conclude that

---

[7] The court in *Zloop* applied federal common law, not New York law. *See* 2019 WL 1320542, at *2. However, federal common law also requires the party asserting the attorney-client privilege to show that the communication itself was made by the client "for the purpose of obtaining legal advice" or by the lawyer "in the course of giving legal advice[.]" *Id.*; *accord Joint Stock Co. "Channel One Russia Worldwide" v. Russian TV Co. Inc.*, 2020 WL 12834595, at *3 (S.D.N.Y. May 1, 2020); *United States v. United Shoe Machinery Corp.*, 89 F. Supp. 357, 358-59 (D. Mass. 1950).

defendants have "failed to meet their burden of establishing a right to protection of the subject [communications]," *id.*, at least insofar as the communications concern the Bonde matter.

I note, however, that some of the exemplars contain discussions between W&K personnel concerning legal matters that the firm was handling for other clients. It appears to the Court that the following portions of the exemplar documents reflect confidential (thus far) communications of this nature:

> Wexler PRIV 00168-00175:  Messages exchanged from 1:38 p.m. to 3:52 p.m.

> Wexler PRIV 00176-00179:  Messages exchanged from 9:58 a.m. to 9:59 a.m. (ending with "Yes, will do").

> Wexler PRIV 00184-00189:  Messages exchanged from 9:55 a.m. to 1:51 p.m. (ending with, "take any chances here"); messages exchanged from 1:55 p.m. (beginning with "K***** Sale") to 7:02 p.m.

> Wexler PRIV 00190-00196:  Messages exchanged from 8:51 a.m. to 9:19 a.m.

Although defendants did not raise this issue in their briefing, I will not require them to produce, to plaintiff, internal firm discussions about other clients. Consequently, defendants may redact the messages identified above when producing the documents in which they are found. Similarly, when producing documents that the Court has not reviewed *in camera*, defendants may redact, on privilege grounds, any portions that reflect or contain confidential communications concerning W&K clients other than Carl Bonde. No other redactions are permitted without further order of the Court.

## V.    CONCLUSION

For the reasons set forth herein, plaintiff's motion to compel production of documents is GRANTED. No later than **December 22, 2023**, defendants shall produce the 154 challenged documents highlighted on their privilege log, redacted only for the purpose authorized herein.

The Clerk of Court is respectfully directed to close the motion at Dkt. 37.

Dated:  New York, New York                    **SO ORDERED.**
        December 8, 2023

_____
**BARBARA MOSES**
**United States Magistrate Judge**